IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


ASHEBORO PAPER AND            )
PACKAGING, INC.,              )
                             )
              Plaintiff,      )
                             )
        v.                    )          1:08cv00914
                             )
MARK ALLEN DICKINSON, JR.,    )
                             )
              Defendant.      )


**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge

Before the court is the motion of Plaintiff Asheboro Paper and
Packaging, Inc. ("Asheboro Paper"), to preliminarily enjoin its
former employee, Defendant Mark Allen Dickinson, Jr. ("Dickinson"),
from competing with it and using or disclosing alleged confidential
and proprietary information. (Doc. 9.) On January 15, 2009, the
court heard argument on Dickinson's motion for expedited discovery
(Doc. 12) and granted the parties the right to conduct discovery
limited to issues raised by Asheboro Paper's request for injunctive
relief. After post-discovery briefing, a preliminary injunction
hearing was held on February 6, 2009. For the reasons set forth
herein, Asheboro Paper's motion is denied.

I.    **BACKGROUND**[1]

Asheboro Paper is a North Carolina corporation with its
principal place of business in Asheboro, North Carolina, that sells

---

[1]  This section constitutes the court's finding of facts.

and distributes packaging products, including tapes, boxes, bags, chipboard, and bubble and foam packaging. (Doc. 9, Ex. A ¶ 2.) On December 19, 2006, it hired Dickinson, who lives in Powhatan County, Virginia, to serve as a sales representative. (Id. ¶ 3; Doc. 22, Ex. C ¶ 22.) Just prior to his hiring, Dickinson was employed by Unisource Worldwide, Inc. ("Unisource"), as an equipment specialist. (Doc. 9, Ex. B ¶ 6.) Unisource is also engaged primarily in the business of distributing paper and packaging supplies, though it conducts business throughout the United States. (Id. ¶ 7.)

Contemporaneously with his hiring by Asheboro Paper, Dickinson executed both an Employment Contract and Agreement and a No-Compete Agreement. (Id. ¶ 9.) The Employment Contract and Agreement provided, among other things, that Dickinson would receive "5% of the profits of the Richmond branch/office and 5% of the sale of the Richmond branch if and when that occurs."[2] (Id., Ex. B, Ex. 1.) The No-Compete Agreement provided, in part:

> 1. The Employee covenants and agrees that he/she will not during the term of said Employment, and for a period of twelve (12) months thereafter, directly or indirectly enter into the employment of or render any service to any other person, firm, company, association, or corporation engaged in the business of selling or distributing any type or kind of packaging products, (tapes, stretch films, polyethylene bags and sheeting and any other products that ASHEBORO PAPER AND PACKAGING,

---

[2] The Employment Contract and Agreement also provided that Asheboro Paper "will pay all attorneys fees associated with potential non-compete suit" (Doc. 9, Ex. B, Ex. 1), presumably referring to Asheboro Paper's hiring of Dickinson from Unisource.

2

INC. sells,[3] including any type of packaging machinery or
service thereof, or any business in any way competitive
thereto, whether or not such products or services were
ever purchased by customers of ASHEBORO PAPER AND
PACKAGING, INC., and that he/she will not during the
period of employment and for a time aforesaid thereafter
engage in any such business on his/her own account, or
become interested therein, directly or indirectly, as an
individual, partner, stockholder, director, officer,
clerk, agent, employee, trustee, or in any other
relationship or capacity whatsoever, all of which
prohibitions shall extend to cover an area described and
limited as follows: Within a 150 mile radius of Asheboro
Paper and Packaging, Inc. and any of its branch offices
in North Carolina and Virginia including any existing
business that he has serviced while in the employ of
Asheboro Paper and Packaging, Inc.

    2.    The Employee further covenants and agrees that
he/she will not during his/her employment by the
employer, and for the period of time aforesaid
thereafter, communicate, divulge or use for the benefit
of any other person, firm, association or corporation,
any of the trade secrets or secret processes used or
employed by the Employer in its business, and that he/she
will not divulge to any such person, firm, association or
corporation, the identity of any customers, past, present
or prospective of the Employer.

(Id. Ex. B, Ex. 2.)  The No-Compete Agreement further provided:

    Whereas, the Employer uses in the said business certain
    trade secrets and secret processes which are highly
    confidential and proprietary to ASHEBORO PAPER AND
    PACKAGING, INC., including but not limited to, price
    lists, methods of pricing, the special and unique needs
    and requirements of customers, catalogs and methods of
    operation. All of these things are deemed trade secrets
    of ASHEBORO PAPER AND PACKAGING AND PAPER, INC. which
    will necessarily be communicated to the Employee by
    virtue of his/her employment by the Employer, and which
    shall place the Employee in an unfair competitive
    position as to ASHEBORO PAPER AND PACKAGING, INC. should,
    for any reason, employment be terminated.

(Id.)

---

[3]  The No-Compete Agreement is missing the closing parenthesis, thus
contributing to some confusion as to its interpretation.

The parties intended that Dickinson, along with another employee, Richard Dewey, would assist Asheboro Paper in establishing and growing a Richmond, Virginia, branch office. (Doc. 22, Ex. C ¶ 2.) Asheboro Paper concedes that at the time it hired Dickinson it did not have an office, distribution center, or any physical location in Virginia. (Id., Ex. D at 28.) During the initial portion of Dickinson's employment, Asheboro Paper investigated options for opening an office in Richmond. (Id., Ex. A ¶ 2; Ex. D at 30.) As "a business decision to best serve the market," Asheboro Paper decided not to establish a formal office or warehouse of its own. (Id., Ex. D at 30.) Dickinson and Dewey, instead, worked from their homes for the entirety of Dickinson's employment. (Id., Ex. A ¶ 2.)

In April 2007, Asheboro Paper contracted with Riverside Logistics Services ("Riverside"), a third-party warehouse provider, to store Asheboro Paper's inventory in Richmond. (Id., Ex. D at 13-14, Ex. F.) Riverside provides space for a number of other companies to store inventory. (Id., Ex. D at 24.) Asheboro Paper has no specific location dedicated to it within the Riverside facility. (Id.) Nor does Dickinson have free access to the facility; rather, he must sign into a visitor's log and be escorted by a Riverside employee. (Id., Ex. A ¶ 4.) Asheboro Paper thus requires Riverside's permission to enter the building, even if only to remove its own goods. (Id., Ex. D at 25.) Asheboro Paper also has no public record of an office in Richmond, no business license

4

to conduct business at the Riverside address, no employees working there, no sign bearing its name at that address, and no telephone or fax number registered to it at that location (all calls being forwarded to its North Carolina office). (Id., Ex. D at 16-17, 22-25.)

By November 24, 2008, Dickinson had decided to resign and to return to work for Unisource and, on that date, sent a letter to Asheboro Paper notifying it of his resignation effective November 28, 2008. (Doc. 9, Ex. B ¶ 19.) Dickinson went back to work for Unisource in Richmond, Virginia, as a sales representative. (Id., Ex. B ¶ 21.)

Shortly after he resigned, Dickinson met with Asheboro Paper co-worker Dewey to discuss wrapping up Dickinson's business. (Doc. 22, Ex. C ¶ 8.) Dickinson offered to return all of the documents in his possession related to Asheboro Paper, but Dewey declined to take them all. (Id.) Dickinson did provide Dewey with a list of his Asheboro Paper customers and all of the documents Dewey thought may be helpful in transitioning the business. (Id.)

Asheboro Paper filed this action originally in North Carolina Superior Court, Randolph County, on December 16, 2008. (Doc. 3.) Asheboro Paper moved for a temporary restraining order, but before it could be heard Dickinson removed the case to this court. (Doc. 1.) The Complaint asserts claims for breach of the No-Compete Agreement and misappropriation of trade secrets, presumably under

North Carolina law, although the Complaint is silent as to any statutory ground.[4]   (Doc. 3.)

## II.  ANALYSIS

This court has jurisdiction pursuant to 28 U.S.C. § 1332. (Doc. 1.)  A preliminary injunction is available under Federal Rule of Civil Procedure 65(a) and is an extraordinary remedy employed in the limited circumstances which clearly demand it.  Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 811 (4th Cir. 1991) (internal citation omitted).  The requirements for obtaining a preliminary injunction in the Fourth Circuit are set forth in Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co., Inc., 550 F.2d 189, 195 (4th Cir. 1977); see also Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 551 (4th Cir. 1994).  Under this circuit's "balance of hardships" test, the four factors to be considered are:  (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest. Direx, 952 F.2d at 812.  The balance of hardships "are the two most important factors," and that analysis should precede the determination of any likelihood of success.  Id. at 813.  The weight to be given to each factor varies according to the

_____

[4]  The parties reported to the court that at about the same time the state court action was filed, Dickinson also filed a Declaratory Judgment action in state court in Virginia.

circumstances of each case.  James A. Merritt & Sons v. Marsh, 791 F.2d 328, 330 (4th Cir. 1986).  Ultimately, Asheboro Paper bears the burden of demonstrating that the Blackwelder factors favor allowing the injunction.  Manning v. Hunt, 119 F.3d 254, 265 (4th Cir. 1997).

### A.   Balance of Hardships

Under the first Blackwelder factor, a plaintiff must make a "clear showing" of actual and immediate irreparable harm. Blackwelder, 550 F.2d at 195; accord Direx, 952 F.2d at 812 (quoting Dan River, Inc. v. Icahn, 701 F.2d 278, 284 (4th Cir. 1983)).  Loss of permanent relationships with customers and loss of proprietary information have been found to constitute irreparable harm.  Multi-Channel, 22 F.3d at 552-53 (affirming district court finding of irreparable harm due to threat of permanent loss of customers and potential loss of goodwill); Merrill Lynch, Pierce, Fenner & Smith v. Bradley, 756 F.2d 1048, 1055 (4th Cir. 1985) (holding irreparable harm established where defendant faced loss of customers when employee resigned and attempted to take former clients); Fed. Leasing, Inc. v. Underwriters at Lloyd's, 650 F.2d 495, 500 (4th Cir. 1981).  Asheboro Paper has demonstrated a clear showing of actual and immediate irreparable harm if an injunction does not issue.

The next step is to determine the likelihood of harm to Dickinson if an injunction is issued.  In re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 526 (4th Cir. 2003); Direx, 952

7

F.2d at 811.  Dickinson argues that an injunction would prevent him from earning a living.  Unisource does business nationally, and Asheboro Paper argues that Dickinson would be free to work in any of Unisource's other territories, just not those specified in the No-Compete Agreement, which would, of course, require him to move some 150 miles or more from home.  (Doc. 23, Ex. D.)  Asheboro also points out that Dickinson has continued to work since his resignation and that the No-Compete Agreement expires in ten months.  For purposes of this motion, the court assumes that Dickinson would be employable in some fashion by Unisource, as Asheboro Paper argues, particularly where he was previously employed in another section of Unisource before Asheboro Paper hired him.  Thus, the court assumes, without deciding, that the balance of hardships tip, even decidedly so, in Asheboro Paper's favor.

**B.   Likelihood of Success on the Merits**

Where the balance of hardships "tips" decidedly in favor of the plaintiff, a preliminary injunction will be granted if "the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." Blackwelder, 550 F.2d 195; accord In re Microsoft, 333 F.3d at 527. This standard is less demanding on a plaintiff than the showing required where the balance tips less so in its favor.  Rum Creek Coal Sales, Inc. v. Caperton, 926 F.2d 353, 359 (4th Cir. 1991).

8

Even so, "there must at least be a strong showing that the case raises grave or serious questions." Berry v. Bean, 796 F.2d 713, 716 (4th Cir. 1986) (quoting James A. Merritt & Sons, 791 F.2d at 330). It is at this stage that Asheboro Paper's claims run aground.

### 1. No-Compete Agreement

The parties agree that North Carolina law applies to the contractual claim. Bueltel v. Lumber Mut. Ins. Co., 134 N.C. App. 626, 631, 518 S.E.2d 205, 209 (1999) (applying law of forum where contract made). North Carolina courts have long stated that covenants not to compete between an employer and employee are not viewed favorably. VisionAIR, Inc. v. James, 167 N.C. App. 504, 508, 606 S.Ed.2d 359, 362 (2004). To be enforceable, a covenant must, among other things, be reasonable as to time, territory, and scope of activity.[5] Id. One of the primary purposes of such a covenant is to protect the relationship between an employer and its customers. A.E.P. Indus., 308 N.C. at 408, 302 S.E.2d at 763. Under North Carolina law, restrictions must be "no wider in scope than is necessary to protect the business of the employer." VisionAIR, 167 N.C. App. at 508, 606 S.E.2d at 362. Where the language of a covenant is overbroad, North Carolina law severely

---

[5] A.E.P. Indus. v. McClure, 308 N.C. 393, 402-03, 302 S.E.2d 754, 760 (1983) (stating that a covenant not to compete must be (1) in writing, (2) made part of the employment contract, (3) based on valuable consideration, (4) reasonable as to time and territory, and (5) designed to protect a legitimate business interest of the employer). The parties do not contest any of the other requirements, and there does not appear to be any serious question that they are met here.

9

limits the court's options to "blue pencil" offending terms. <u>Hartman v. W.H. Odell and Assocs., Inc.</u>, 117 N.C. App. 307, 317, 450 S.E.2d 912, 920 (1994). Unless the overbroad portion is "a distinctly separable part of a covenant," North Carolina courts cannot rewrite the contract and will simply not enforce it. <u>Id.</u>; <u>VisionAIR</u>, 167 N.C. App. at 508, 606 S.E.2d at 362. The burden of proof remains on the party seeking to enforce the covenant. <u>Hartman</u>, 117 N.C. App. at 311, 450 S.E.2d at 916.

### a. Territorial Reasonableness

A territorial restriction is reasonable "only to the extent it protects the legitimate interests of the employer in maintaining [its] customers." <u>Id.</u> 117 N.C. App. at 312, 450 S.E.2d at 917. Thus, where a primary purpose of the covenant is to protect the employer's relationship with its customers, as here, the employer must demonstrate the actual location of its customers to permit a finding that the territorial restriction is reasonable. <u>Id.</u> at 313-14, 450 S.E.2d at 917-18. In assessing the reasonableness of the geographic restriction of a covenant, North Carolina courts look to six overlapping factors: "(1) the area, or scope, of the restriction; (2) the area assigned to the employee; (3) the area where the employee actually worked or was subject to work; (4) the area in which the employer operated; (5) the nature of the business involved; and (6) the nature of the employee's duty and his knowledge of the employer's business operation." <u>Okuma Am. Corp. v. Bowers</u>, 181 N.C. App. 85, 89, 638 S.E.2d 617, 620 (2007). North

Carolina courts have upheld multi-state restrictions, especially where, as here, the time period is not excessive, as long as the employer demonstrates their reasonableness. See, e.g., Clyde Rudd & Assocs., Inc. v. Taylor, 29 N.C. App. 679, 684, 225 S.E.2d 602, 605 (1976) (upholding four-state restriction against former salesman where evidence showed employer in fact did business state-wide in each state).

The No-Compete Agreement here suffers from several problems related to its territorial restriction. First, Asheboro Paper has failed to demonstrate the actual existence of a "branch office" in Virginia. All of the evidence strongly indicates that, while Asheboro Paper intended to establish a Virginia office, one never materialized. It would not be reasonable to interpret Dickinson's home as the branch office, either, because Asheboro Paper's other Virginia-based employee, Dewey, resided elsewhere. Thus, it is hard to calculate a radius from a non-existent point. Asheboro Paper argues that the "branch office" was understood by everyone to mean Dickinson and Dewey, its two employees working in the Commonwealth of Virginia. (Doc. 23 at 7-8.) While that may be true, such an interpretation would reduce the "branch office" reference in the No-Compete Agreement to a concept rather than a place and fail to establish any reasonable basis from which to calculate a territorial restriction of 150 miles.[6]

---

[6] The court expresses no view on whether the reference to the "Richmond branch/office" in the Employment Contract and Agreement bears
(continued...)

Second, even assuming a Virginia "branch office" could be said to have existed, Asheboro Paper has failed to indicate the location of its customers within the restricted area to demonstrate that the geographic scope is necessary to maintain those customer relationships.  Hartman, 117 N.C. App. at 312, 450 S.E.2d at 917.[7] The closest Asheboro Paper gets is the statement of William Dawson, its Vice President, that it "does business throughout the states of North Carolina and Virginia," and that "[t]he majority of [its] business in Virginia is conducted within a 150 mile radius of Asheboro Paper's location in Richmond, Virginia." (Doc. 23, Ex. B ¶ 4.)  However, no customer lists or locations to justify the 150-mile radius were presented, and conclusory statements are not sufficient under North Carolina law to support the geographic scope of a covenant not to compete.  See Hartman, 117 N.C. App. at 313-14, 450 S.E.2d at 918.  In fact, at the hearing on preliminary injunction, Asheboro Paper had (but, despite the entry of a confidentiality order, did not file under seal or seek to admit) a list of customers that Dickinson allegedly serviced in Virginia. A 150-mile radius from the Richmond area clearly exceeds the borders of Virginia, however, and covers portions of Delaware,

---

[6](...continued)
its own meaning in terms of calculating profits.

[7]    At the court's January 15, 2009, hearing on Asheboro Paper's motion to expedite briefing and Dickinson's motion to expedite discovery, the court specifically advised the parties to examine carefully the proof requirements, as set forth in Hartman, for enforcing territorial restrictions in no-compete covenants.

12

Maryland, the District of Columbia, and West Virginia, yet Asheboro Paper does not purport to do business there. (Doc. 23, Ex. B ¶¶ 3, 4.) Asheboro Paper also conceded in its briefing (Doc. 10 at 11) and at the preliminary injunction hearing that Dickinson served no clients that were located within the 150-mile radius but outside the Commonwealth of Virginia. A restriction outside an employee's operating area may be enforced only if the employer actually does business there. <u>Clyde Rudd</u>, 29 N.C. App. at 680, 225 S.E.2d at 603.

Third, there has been no demonstration that Dickinson's or Asheboro Paper's customers covered the Commonwealth of Virginia to show that a state-wide restriction would be reasonable. Where the territory is too broad, "the entire covenant fails since equity will neither enforce nor reform an overreaching and unreasonable covenant." <u>Hartman</u>, 117 N.C. App. at 312-13, 450 S.E.2d at 917-18; <u>Henley Paper Co. v. McAllister</u>, 253 N.C. 529, 534-35, 117 S.E.2d 431, 434 (1960) (holding that the court "cannot by splitting up the territory make a new contract for the parties").

Asheboro Paper further argued at the hearing that the 150-mile radius represents the range from which Asheboro Paper can economically make deliveries from its Riverside warehouse in Richmond. This argument is unsupported in the record and, even if it were, would be an insufficient basis upon which to restrain

13

competition in the absence of a demonstration Asheboro Paper actually does business there.[8]

Fourth, Asheboro Paper argues that, even if no Virginia branch office existed, the No-Compete Agreement prohibits Dickinson from servicing "any existing business that he has serviced while in the employ of Asheboro Paper and Packaging, Inc." Asheboro Paper contends that this establishes a separate, customer-based restriction that is reasonable. (Doc. 23 at 8.) It is true that a prohibition against soliciting customers is deemed *per se* reasonable. See, e.g., United Labs., Inc. v. Kuykendall, 322 N.C. 643, 660, 370 S.E.2d 375, 386 (1988). However, here the clause is contained in the sentence that defines the 150-mile radius, thus rendering its meaning at best ambiguous. Such an ambiguity is to be construed against the drafter, Asheboro Paper, as covenants not to compete are in restraint of trade and are to be strictly construed against the drafting party. Washburn v. Yadkin Valley Bank & Trust Co., 660 S.E.2d 577, 584 (N.C. App. 2008). Even if the court were to adopt Asheboro Paper's interpretation (and reject a reading that the phrase defines the 150-mile radius), the restriction would fail because the rest of the sentence, which has

---

[8]    Asheboro Paper's pricing and other alleged proprietary and confidential information could support the 150-mile restriction, but Asheboro Paper failed to demonstrate that it did business within the proposed area to justify the size of the restriction.

14

not been supported on this record, is not separable so as to be capable of being blue-penciled out.[9]

Thus, taking into account all the factors considered by North Carolina courts, the court concludes that Asheboro Paper has failed to support the territorial restriction.

### b. Legitimate Business Interest

A non-competition covenant must be no wider in scope than is necessary to protect a legitimate business of an employer. Hartman, 117 N.C. App. at 316, 450 S.E.2d at 919. Where a covenant is too broad to constitute a reasonable protection of the employer's business, it will not be enforced. Whittaker Gen. Med. Corp. v. Daniel, 324 N.C. 523, 528, 379 S.E.2d 824, 828 (1989).

Here, the No-Compete Agreement defines the scope of the employment to be prohibited as a function of the 150-mile radius, which the court has already found lacking on this record. In the absence of a demonstration that the territorial restriction is valid, therefore, the scope restriction fails.

---

[9]  The No-Compete Agreement also prohibits Dickinson from working within 150 miles of *both* Asheboro Paper's alleged Richmond branch office *and* its main location in Asheboro, North Carolina. Dickinson denied ever serving any of Asheboro Paper's North Carolina-based customers, a fact unrebutted by Asheboro Paper. (Doc. 22, Ex. A ¶ 10.) Such a provision could be sustained to protect against unfair competition based on an employee's use of proprietary information, Clyde Rudd, 29 N.C. App. at 680, 225 S.E.2d at 603. It would be overbroad to the extent Asheboro Paper relies principally on Dickinson's knowledge of customers. See Doc. 10 at 10. But because Asheboro Paper did not demonstrate the location of its customers (other than with conclusory statements) and the provision is not separable, it cannot be a basis for relief at this time.

15

The No-Compete Agreement also seeks to preclude Dickinson not only from competing with Asheboro Paper, but also from working for a competitor in any capacity. For example, it prohibits him from working "directly or indirectly" with, "or render[ing] any service to," any person or firm engaged in the business of selling or distributing packaging products within the defined territory. (Doc. 9, Ex. B, Ex. 2.) The covenant does not limit itself to performing only an identical service for a competitor. Cf. Precision Walls, Inc. v. Servie, 152 N.C. App. 630, 638, 568 S.E.2d 267, 273 (2002) (concluding that "it is within plaintiff's legitimate business interest to prohibit defendant from working in an identical position with a competing business"); Okuma, 181 N.C. App. at 86, 638 S.E.2d at 618 (reversing motion to dismiss where covenant expressly permitted employment "in an area of the competitor's business which does not compete with [employer]").

The No-Compete Agreement further prohibits Dickinson from "engag[ing] in any such business on his/her own account, or becom[ing] interested therein, directly or indirectly, as an individual, partner, stockholder, director, officer, clerk, agent, employee, trustee, *or in any other relationship or capacity whatsoever.*" (Doc. 9, Ex. A, Ex. 2 ¶ 1) (emphasis added.) Where a covenant requires an employee to have no association whatsoever with any business irrespective of whether he or she would be in a position to compete or divulge protected information, the covenant is overbroad. Hartman, 117 N.C. App. at 317, 450 S.E.2d at 919-20

16

(finding no compete agreement overly broad where "it requires [the former employee] to have no association whatsoever with any business that provides [the same or similar] services" and noting that "[s]uch a covenant would appear to prevent plaintiff from working as a custodian for any 'entity' which provides [the same or similar] services"); see also VisionAIR, 167 N.C. App. at 508, 606 S.E.2d at 362 (refusing to enforce no compete agreement that prevented employee from performing unrelated work for a similar company or "indirectly" owning any similar firm); Electrical South, Inc. v. Lewis, 96 N.C. App. 160, 169, 385 S.E.2d 352, 357 (1989), disc. rev. denied, 326 N.C. 595, 393 S.E.2d 876 (1990) (invalidating covenant because it focused on the employee's association with another company, wherever located, which may be linked with the company's competitors within the restricted territory); Henley Paper, 253 N.C. at 534-35, 117 S.E.2d at 434 (finding no-compete covenant overbroad where it "excludes the defendant from too much territory and from too many activities").

Asheboro Paper relies on Precision Walls, Inc. v. Servie, 152 N.C. App. 630, 568 S.E.2d 267 (2002), to argue that a former employee may be enjoined from all employment with a competitor in the same position. In that case, the covenant provided that the former employee "will not, directly or indirectly, . . . [w]ithin the Territory [defined as North and South Carolina], be engaged in the Business, or employed, concerned, or financially interested in any entity engaged in the Business." Precision Walls, 152 N.C.

App. at 632, 568 S.E.2d at 269. The court enforced the no-compete against the employee, a seller and installer of interior and exterior wall systems, to prohibit him from being employed in an identical position with a competitor. Id. at 638, 568 S.E.2d at 273. The court also rejected the employee's argument that this provision would bar the employee from working with a competitor "in any capacity." Id. at 639, 568 S.E.2d at 273. The court concluded that "plaintiff's legitimate business interest allows the covenant not to compete to prohibit employment of any kind by defendant with a direct competitor." Id. It is difficult to square this decision cleanly with the rest of the North Carolina cases. Even the court in VisionAIR two years later (in an opinion written by Judge Wynn, who joined in Precision Walls) took pains to distinguish it, noting that it appeared to depart from precedent, citing Hartman.[10] And in 2007, the court (again in an opinion written by Judge Wynn) reaffirmed the Hartman rule that prohibits a covenant from barring any association with a business providing similar services. Okuma, 181 N.C. App at 91, 638 S.E.2d at 621 (finding that the restrictive covenant's express exception permitting work in an area of a competitor that does not compete with the employer "thread[s] the needle between those [terms] in Precision Walls, which were found to be valid and enforceable, and those in VisionAIR, which were

---

[10]    It is noteworthy that the covenant in Precision Walls had separable provisions, including one against soliciting former customers, and defined the territory as two states in which it was not disputed that Precision Walls did business state-wide. 152 N.C. App. at 631-32, 568 S.E.2d at 269.

struck down").[11]  Thus, based on the existing precedent, it appears that <u>Precision Walls</u> is distinguishable and that <u>VisionAIR</u> more closely resembles the factual scenario presented here.

A covenant must rise or fall integrally.  <u>Henley Paper</u>, 253 N.C. 529 at 535, 117 S.E.2d at 435.  These overbroad terms are not distinctly separable portions that the court could "blue pencil" without effectively rewriting the covenant.  <u>See</u> <u>VisionAIR</u>, 167 N.C. App. at 508, 606 S.E.2d at 362; <u>Hartman</u>, 117 N.C. App. at 317-18 450 S.E.2d at 920.  Accordingly, the court finds that the No-Compete Agreement is facially broader than necessary under North Carolina law to protect the legitimate business of the employer.  Thus, as to the No-Compete Agreement, Asheboro Paper has failed to demonstrate questions going to the merits "so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." <u>Blackwelder</u>, 550 F.2d 195; <u>accord</u> <u>Berry</u>, 796 F.2d at 716 (denying preliminary injunction based on failure of showing regarding merits despite balance of hardships).

## 2.  **Trade Secret Protection Act Claim**

Asheboro Paper contends that Dickinson was provided a host of allegedly confidential and proprietary information, including customer lists, pricing information, product and sales information,

---

[11]    <u>Okuma</u> also involved a very high level executive, one of the employer's six most senior officers, who participated in the most critical strategic decisions made by the company.  181 N.C. App. at 91, 638 S.E.2d at 621.

19

and information about customers and their relationships with it (including types and quantities of items purchased, margins, and dates of sales). (Doc. 23, Ex. B ¶¶ 6-7.) It contends that Dickinson has either misappropriated such information or that there is a very real likelihood that he will do so. Dickinson argues that Asheboro Paper has failed to sufficiently identify trade secret materials, contends that what it has identified was never provided to Dickinson during his employment, and denies that he has disclosed any such information. (Doc. 22 at 16-18.)

Under choice of law rules, North Carolina law applies. Merck & Co v. Lyon, 941 F. Supp. 1443, 1455 (M.D.N.C. 1996). The North Carolina Trade Secret Protection Act provides that "actual or threatened misappropriation of a trade secret may be preliminarily enjoined during the pendency of the action." N.C. Gen. Stat. § 66-154(a). The alleged trade secret information must be identified "with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." Analog Devices, Inc. v. Michalski, 157 N.C. App. 462, 468, 579 S.E.2d 449, 453 (2003). An employer must demonstrate that it took reasonable measures to protect the trade secrets. N.C. Gen. Stat. § 66-152(3); Eli Research, Inc. v. United Commc'ns Group, Inc., 312 F. Supp. 2d 748, 756-57 (M.D.N.C. 2004); Area Landscaping, L.L.C. v. Glaxo Wellcome, Inc., 160 N.C. App. 520, 525-26, 586 S.E.2d 507, 511-12 (2003). Customer pricing lists,

cost information, confidential customer lists, and pricing and
bidding formulas can constitute trade secrets.   Sunbelt Rentals,
Inc. v. Head & Engquist Equip., L.L.C., 174 N.C. App. 49, 53, 620
S.E.2d 222, 226 (2005); Area Landscaping, 160 N.C. App. at 525-26,
586 S.E.2d at 511-12.   Customer names and addresses may not be
protected as a "trade secret" inasmuch as they can be readily
ascertained through independent development. UBS PaineWebber, Inc.
v. Aiken, 197 F. Supp. 2d 436 (W.D.N.C. 2002).  Misappropriation of
trade secret information can constitute irreparable harm.   Id.

    At the January 15, 2009, hearing, the court directed Asheboro
Paper to identify exactly what it contends constitutes trade
secrets that were made available to Dickinson.  Asheboro Paper has
provided a host of general categories of information it claims it
provided to Dickinson, as noted above.  Asheboro Paper's Dawson
testified that he has reviewed the "documents produced in
discovery" and affirms that they are "exactly the types of
confidential information and proprietary documents and information
provided to Dickinson."  (Doc. 23, Ex. B ¶ 8.)   Dickinson
acknowledges that Asheboro Paper did identify certain price lists
and customer lists in response to the court's direction, but he
claims that the ones so identified were never given to him.  (Doc.
22, Ex. D at 55.)  Dickinson admitted generally in his deposition
that he was provided and still had in his possession documents
containing names of customers and pricing and margin information
(though he was never asked to further identify such information),

which he denied having looked at since his resignation. (Doc. 23, Ex. E at 11-13.) So, there is some lack of clarity as to what was allegedly given to Dickinson, though the court will assume for its analysis that the trade secret information has been sufficiently identified. Analog Devices, 157 N.C. App. at 468, 579 S.E.2d at 453. Moreover, Dickinson does not contest that Asheboro Paper took reasonable steps to attempt to protect the alleged trade secret information. (Doc. 22 at 18-20.)

The primary difficulty is that there does not appear to be any misappropriation, either in fact or threatened, under either the Trade Secret Protection Act or under the No-Compete Agreement. The No-Compete Agreement acknowledges that use or disclosure of trade secret material shared with Dickinson is prohibited (Doc. 9, Ex. B, Ex. 2 ¶ 2), but it never requires that the material be returned. This is particularly important here because of Dickinson's unique employment situation where he worked out of his home inasmuch as Asheboro Paper never established a physical facility in Richmond. Therefore, he kept his paperwork at home. His resignation alone did not violate any term of the No-Compete Agreement or Trade Secret Protection Act in this regard, and Dickinson freely met with Dewey, Asheboro Paper's only other representative in Virginia, in order to transition his business and to return the materials. Cf. VisionAIR, 167 N.C. App. at 506, 606 S.E.2d at 360 (agreement mandated surrender of all trade secrets upon departure). The record reflects that, for whatever reason, Dewey indicated that he

did not need or want whatever materials Dickinson possessed, and there is no indication that Asheboro Paper ever thereafter requested their return. Thus, this is not a situation where an employee resigns, takes protected materials from his office, and is not forthright as to his intentions. <u>Cf.</u> <u>Merck & Co.</u>, 941 F. Supp. at 1461-62 (holding threat of misappropriation shown).

That presents the next problem. Though Dickinson was deposed, there is no record, other than in the most general terms, of what materials he possessed. Asheboro Paper represented at the preliminary injunction hearing that his returning whatever he retained in his files would "go a long way" toward resolving its concerns. Dickinson has not only *not* threatened to use any of the alleged trade secret information (assuming the price lists and margin information from November 2008 are current now), he now represents that he has returned all the documents alleged to constitute trade secrets. (Doc. 25, Ex. A.)

Under North Carolina law, customer information maintained in the memory of a departing employee is not a trade secret. <u>Quantum Health Res. v. Hemophilia Res. of Am., Inc.</u>, No. 2:95CV00230, 1995 U.S. Dist. LEXIS 16726, at *31 (M.D.N.C. Sept. 18, 1995). North Carolina courts also "are reluctant to prevent an employee from working for a competitor merely for the purpose of protecting confidential information." <u>Merck & Co.</u>, 941 F. Supp. at 1459. They have done so in circumstances suggesting bad faith or underhanded dealing. <u>Id.</u> On this record, there is simply

23

insufficient evidence of misappropriation or bad faith, actual or threatened, to support injunctive relief.

### C. Public Interest

In this case there are competing public interests. Asheboro Paper has a legitimate interest in developing its customer relationships and being able to freely share confidential and proprietary information with its employees without fear it will end up in the hands of a competitor. Travenol Lab., Inc. v. Turner, 30 N.C. App. 686, 691, 228 S.E.2d 478, 483 (1976). The public interest is also served by ensuring that legitimate contracts are enforced. UBS PaineWebber, 197 F. Supp. 2d at 448. Dickinson has a legitimate interest in remaining free to seek employment with "the highest and most congenial bidder," and the North Carolina courts disfavor restrictions on that interest. FMC Corp. v. Cyprus Foote Mineral Co., 899 F. Supp. 1477, 1484 (W.D.N.C. 1995). An employee also cannot be prohibited from taking with him his general knowledge and expertise, Merck & Co., 941 F. Supp. at 1461, and Dickinson is bound by the separable non-disclosure provisions of his No-Compete Agreement.

The question is where the equities lie. There is no evidence that Dickinson has failed to be forthright about his intentions, having given advance notice of his resignation and meeting with Asheboro Paper's designee, Dewey, to transition business and to return all information Dickinson maintained at his home office. Given Dickinson's employment as a salesman, Asheboro Paper's

24

legitimate interests are largely its customer relationships and the prevention of a former employee from competing with knowledge of its confidential information, which rises or falls on the validity of the No-Compete Agreement. The court also notes that in hiring Dickinson from Unisource just over two years ago, Asheboro Paper agreed to indemnify him for all attorneys' fees in what appears to have been a potential lawsuit on a no-compete agreement between Dickinson and Unisource. On balance, the court concludes that the public interest does not favor enjoining Dickinson from working with Unisource or from disclosing or using any alleged trade secrets "merely to allay the fears and apprehensions or to soothe the anxieties of a party." <u>FMC Corp.</u>, 899 F. Supp. at 1484.

## III. CONCLUSION

For the foregoing reasons, IT IS THEREFORE ORDERED that Asheboro Paper's motion for preliminary injunction (Doc. 9) is DENIED.


　　　　　　　　　　　　　　　　　　　/s/ Thomas D. Schroeder
　　　　　　　　　　　　　　　　　　　United States District Judge

February 19, 2009